UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DOUGLAS LAURA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:14-cv-00890-SEB-MJD |
| | ) | |
| FUJI COMPONENT PARTS USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant Fuji Component Parts USA, Inc.'s

("Fuji") Motion for Summary Judgment [Docket No. 37], filed on May 8, 2015. For the

reasons detailed in this order, Defendant's motion is **GRANTED in part** and **DENIED**

**in part**.

**Factual Background**

Fuji is an Indiana corporation and a wholly owned subsidiary of the Japanese

company, Fuji Buhin Industries, Inc. Dkt. 10. Fuji operates a sales and distribution

facility in Indianapolis, Indiana. Rhodes Aff. at ¶ 2. Douglas Laura is an African-

American employee at the Indianapolis facility. Compl. at ¶ 1.

**I.      Laura's Job Titles and Promotions**

Mr. Laura first began working at Fuji as a temporary worker in May 2007. Laura

Dep. 22:12–28:4. He was hired as a full-time Team Leader in Fuji's Prep Area three

weeks later, in June 2007. *Id.* Based on the recommendation of Susan Thomas, Fuji's

1

Manager of Human Resources at the time, Laura was promoted to the position of Warehouse Supervisor during his first year with the company. *Id.* at 82:10–85:24.

Over the course of the next three and a half years, Thomas consistently recommended that Laura again be promoted from Warehouse Supervisor to Assistant Warehouse Manager, a position that became vacant in July 2008. *Id.* at 89: 12–13; Maehara Dep. 14:17–22. Despite Thomas's recommendations, Fuji's then current president, Kazuo Sato, declined to promote Laura, choosing instead to leave the Assistant Warehouse Manager position unfilled. Laura Dep. at 91:3–9; Thomas Dep. 250:21–251:5. Although Laura did not receive a promotion to Assistant Warehouse Manager when the position became vacant, he assumed responsibility for the duties that would have been assigned to the Assistant Warehouse Manager had the position been filled. Maehara Dep. 14:23–15: 22; Tanahara Dep. 37:19–38:24; Laura Dep. 110:6–7, 269:16–19; 89:18–24. Laura eventually was named Assistant Warehouse Manager in February 2012 by Makoto Maehara, who had returned as Fuji's president in 2011. [1] Maehara Dep. 88:24–89:16. Laura claims in this action that Fuji's excessive delay in prmoting him to Assistant Warehouse Manager was unlawful in violation of 42 U.S.C. § 1981.

After Laura became the Assistant Warehouse Manager in February 2012, Fuji's organizational chart reflected that his direct supervisor was the Senior Warehouse Manager, Tomoyasu Masuyama. Dkt. 42-1 at 6. Masuyama testified, however, that although Fuji's president requested that he temporarily serve as the Senior Warehouse

---

[1] Kazuo Sato served as president of Fuji from 1996 to 2000 and from April 2008 to June 2011. Maehara Aff. at ¶ 4. Yasuhiko Suda served as president from 2000 to April 2005. *Id.* at ¶ 5. Makoto Maehara served as president of Fuji from April 2005 until March 2008 and from June 2011 to the present day. *Id.* at ¶ 3.

Manager, he never officially assumed that role or exercised control over the Warehouse Department. Masuyama Dep. 6:22–7:16. It is undisputed that when Barbara Smith was terminated from her employment as Assistant Warehouse Manager, Laura became the highest ranking employee in the Warehouse Department, reporting directly to President Makoto Maehara. Laura claims that Masuyama was listed as the Senior Warehouse Manager in order for Fuji to avoid promoting him to that position. See Dkt. 42 at 32 ("Fuji put him there to avoid putting Laura there.").

In October of 2014, President Maehara revised the organizational chart to remove Masuyama's designation as Senior Warehouse Manager since the previous chart did not correctly reflect the responsibilities in the Warehouse Department at that time. Maehara Dep. 9: 7–21. Under the new organizational chart, Masuyama retained his title as a Manager of Subaru Sales and was also listed as Manager of Production; Maehara was listed as President of Fuji and acting Senior Manager of all five Fuji. Below is a comparison of the two organizational charts; the first chart depicts the original staffing arrangement, and the second chart reflect the revise assignments:



The Organization Chart of Fuji Component Parts USA, Inc.

9/3/2014
Approval: M.Maehara
Issued:T.Masuyama
Employees: 33
Temps: 11
44
President

FUJI 0276



The Organization Chart of Fuji Component Parts USA, Inc.

10/16/2014
Approval: M.Maehara
Issued:T.Masuyama
Employees: 35
Temps: 10
45
President

As both charts reveal, neither the Warehouse Department nor the Quality Assurance Department includes a "Manager" position between those of the Assistant Manager and Senior Manager. Dkt. 42-1 at 6. As a result, Horace Tucker and Douglas Laura acted as the highest ranking employees and *de facto* heads of their respective departments, although each held the title of Assistant Manager. Mr. Laura claims that this lesser designation as a "less distinguished title" also constituted an unlawful discrimination in violation of 42 U.S.C. § 1981.

## II.     Mr. Laura's Compensation

After assuming responsibility for leadership of the Warehouse Department in 2008, Laura continued to receive the same hourly rate of pay of $16.62 until January 28, 2012; thereafter, his hourly pay was raised to $18.27. Dkt. 44-1. Laura was compensated at that hourly rate until March 2013, when President Maehara shifted him from hourly pay to a bi-weekly salary of $1,730.87, an amount equal to his pay during the previous two years, including overtime. Maehara Dep. 20:25–21:10; Rhodes Aff. ¶ 5. The following spring, in April 2014, Maehara gave Laura a 1.11% raise, bringing his bi-weekly salary from $1,730.87 to his current rate of $1,750.00. Rhodes Aff. ¶ 5.

Following this raise, Laura met with Maehara to secure an explanation for his one-percent raise when he believed "other people had received something else." In that regard, he requested a written evaluation supporting Maehara's decision. Laura Dep. 66–68, 101–106. Maehara, who is the direct supervisor of all five Fuji department heads, informed Laura that he has never completed a formal, written evaluation of any of the department leaders, but that, in reviewing Laura's performance, he routinely considered

5

Laura's overall work ethic, attendance, leadership qualities, and effective management skills. Maehara Dep. at 48–49, 57. Maehara expressed to Laura that he felt the raise, which was only six one-hundredths of a percent lower than the median 1.17% raise for all Fuji employees, was fair, and instructed Laura to reduce the number of labeling errors, shipment errors, and workplace accidents in the warehouse in order to improve his status at Fuji. *Id.*; Maehara Dep. 39–40.

In bringing this lawsuit, Laura claims that he was not paid an appropriate salary together with appropriate raises and bonuses for the work he performs at Fuji. Dkt. 42 at 17, ¶ 6. He also claims that Fuji's failure to issue him written performance violations was unlawful, in violation of 42 U.S.C. § 1981. *Id* at ¶ 8. Lastly, Laura claims that after he transitioned from hourly pay to salary, he was not compensated for overtime work although other salaried Fuji employees were. Dkt. 42 at 17, ¶ 5. Each of these deficiencies by Fuji with respect to Laura's employment is, in his view, discriminatory based on his race.

### III.   Susan Thomas's Testimony

Mr. Laura has relied heavily on the testimony of Susan Thomas to support his claims of discrimination. Thomas assumed the role of Human Resources Manager for Fuji in 2003 and served as an upper-level manager of Human Resources and Operations until she voluntarily resigned from her employment in February 2014. Thomas Dep. 31:12–32:24.

Thomas testified that on one occasion Japanese members of Fuji's parent company were visiting the Indianapolis facility and happened to observe her hosting a "morning

meeting" with employees, after which Takayuki Abe informed Thomas that she should no longer conduct planning or management meetings as that was a duty reserved for Japanese expatriates.[2] Thomas Dep. 37:1–7, 255:1–25. Thomas was granted a meeting with the parent company directors during their visit during which Hiroshi Watanabi, the Director and Chief Adviser of Fuji's parent company, "clearly stated that [Fuji] was a Japanese company, and it [would] be run by Japanese." Thomas Dep. 55:6–11. According to Thomas, President Maehara was present at both meetings and although he never directly expressed that only Japanese expatriates could hold management positions, he acquiesced in the parent company's preference in that regard. Thomas Dep. 58:1 –6.

With regard to Laura, Thomas testified that he endured "constant badgering" from former Fuji President Kazuo Sato, and that it "was reported" to her that Sato had threatened to replace Laura, along with everyone else, with Japanese employees who he felt could do their jobs much more quickly. Thomas Dep. 188:18–25. Following these threats, a meeting was held at which Thomas heard Sato refer to Laura as "useless." *Id.* at 230:10–19. She testified further that, in her opinion, Fuji discriminated against Laura on the basis of his race because "[when Laura] first came on board, he was not encouraged to communicate with customers, especially Subaru, [Fuji's] largest customer. It took a very long time for him to get to that spot." 222:11–18. She added further that Laura, who was a top performer, was treated differently than people who did not perform as well or facilitate as many improvements as he had. 222:23–223:19. Lastly, Thomas testified that if Laura had performed the same quality of work but had been Japanese rather than

---

[2] It is unclear what position Takayuki Abe held either within Fuji or its parent company, only that he was charged with delivering this message to Thomas after the visiting directors observed the meeting.

African-American, he would have made more money and obtained a higher-ranking job title than those assigned to him by Fuji. *Id.* at 253:5–15.

### Scope and Nature of Present Action

Laura's lawsuit commenced on June 2, 2014. In his Complaint, Laura asserts that he "was treated in a disparate manner as to the terms, conditions, and privileges of his employment *as compared to other similarly situated Caucasian co-workers*." Dkt. 1 at ¶ 11 (emphasis added). He further alleges that "Fuji intentionally and/or with reckless disregard discriminated against him in the terms, conditions and privileges of his employment on the basis of his race *in the payment of the wages earned by him*." *Id.* at ¶ 13 (emphasis added).

During discovery, Fuji requested that, in connection with the allegations in Paragraph 11 of his Complaint, Laura identify each and every similarly situated Caucasian co-worker, who, in comparison to him, he alleges to have been treated in a disparate manner in the terms, conditions, and privileges of their employment. Dkt. 39-6 at 7. In response to this Interrogatory, Laura provided the names of five Caucasian co-workers: (1) Barbara Smith, (2) Jim Christie, (3) Nigel Christen, (4) Laura Harper, and (5) Mike French. *Id.*  In addition, Laura stated: "Discovery has revealed that I may be a victim of discrimination by virtue of disparate treatment by members of the Asian racial group in addition to my treatment with respect to members of the Caucasian racial group." *Id.*

On February 18, 2015, Fuji's counsel requested "supplementation" of Laura's response to this Interrogatory. Laura declined to supplement the prior respond, now contending that it was, in fact, "an entirely new interrogatory," given that it was a request

8

for the names of the Asian co-workers who, in comparison with Laura, were alleged to have been treated disparately, whereas the original interrogatory asked only for similarly situated Caucasian co-workers. Dkt. 42 at 20 n.1.

Fuji deposed Laura on March 12, 2015. Laura was asked to identify any co-worker, beyond the five already-identified Caucasian co-workers, who he alleged were treated disparately based on race. Laura Dep. 242:1–11. Laura testified that he believed other employees beyond those five had been treated in a racially disparate fashion, but that he could not recall any of their names. *Id.* Fuji also asked Laura to identify the manner in which he believed his co-workers were treated differently, to which Laura responded: (1) wages and salary; (2) disciplinary actions; (3) the manner in which the co-workers are "talked to"; (3) attendance; and (4) the qualifications required of his co-workers to achieve their positions. Laura Dep 244:8–245:1.

Pursuant to the Court's Case Management Plan, discovery ended on April 1, 2015. On April 10, 2015, the parties filed their "Statement of Claims & Legal Theories." Dkt. 31. In relevant part, Laura's "Statement" provides as follows:

* * *

4. Laura is a member of a protected class, as he is an African-American and he is a non-Asian.

5. Laura has been continuously employed by Fuji for more than the last four years and remains so while he has been continually meeting the legitimate expectations of Fuji in the performance of his job duties.

6. The former Human Resources Director of Fuji has acknowledged that Laura was the subject of adverse job action by Fuji management because he is an African-American and because he is not Japanese, that is, he is not Asian.

9

7. Non-Japanese persons were, and are, not eligible to occupy senior management positions, or independently make upper management decisions at Fuji.

8. The president of Fuji held, and expressed, the pre-conceived notion that Laura was useless because he is an African-American and is not Japanese. He referred to Laura as being a useless person.

9. Laura has been mistreated as a Fuji employee because he is a member of protected classes.

10. Laura has suffered adverse job action in that he has not been promoted to job positons for which he is, and was, qualified, namely Warehouse Manager and Senior Warehouse Manager, but kept in a more lowly position while being assigned all of the work of a Warehouse Manager and while the job of Warehouse Manager remained open, in spite of numerous recommendations from Fuji's head of Human resources that he be promoted.

11. Laura was also denied promotion to the position of Senior Warehouse Manager while the position was pre-textually filled by unqualified Asian persons who were not doing the work required by that position while Laura was doing it.

12. Laura has suffered adverse job action in that he has not been paid in the manner which he should have been paid, namely overtime pay compensation when other salaried employees of Fuji who were not members of Laura's protected class, were paid such overtime compensation.

13. Laura has suffered adverse job action in that he has not been paid in the manner which he should have been paid, namely periodic and appropriate raises in salary, and bonuses, for the work that he was performing, including the substantially increased responsibilities of a Warehouse Manager and/or Senior Warehouse Manager and in spite of the tremendous growth of Fuji, along with a concurrent increase in Laura's job responsibilities and work.

14. Laura has suffered adverse job action that has impeded his career, namely by not assigning him title of Warehouse Manager and/or Senior Warehouse Manager, but rather denominating him as a Warehouse Supervisor or Assistant Warehouse Manager, when he was actually performing all of the duties of several

positions, namely: Team Lead of Receiving, Team Lead of Shipping, Warehouse Manager and Senior Warehouse Manager.

15. Laura has suffered adverse job action that has impeded his career, namely by not providing written and appropriate performance evaluations of his work, so that he was actually evaluated in a discriminatory manner.

16. The action of Fuji in placing unqualified person in the position of Warehouse Senior Manager were taken as a pretext so as to avoid having to place Laura in the position of Warehouse Manager and/or Warehouse Senior Manager while requiring him to perform the duties of those jobs (and others) and to avoid paying him wages consummate with the work being done in all of those positions.

17. Fuji failed and declined to provide Laura with necessary training that it was acknowledged by Fuji management he should have been given in order for Fuji to be able to pre-textually deny him the positions of Warehouse Manager and/or Senior Warehouse Manager.

18. Fuji created one or more false organizational charts that were utilized in the operation of its business when the actual organizational chart which Fuji provided to its parent company in Japan revealed that Laura was not in the actual positon that he occupied, and this action was taken as a pretext to deny him advancement with Fuji through the approval of those persons with the actual authority to make decisions regarding Laura's pay and job positions.

19. Fuji managed denied Laura the same opportunities to interact with its customers that it extended to other non-protected class employees.

* * *

Laura's laundry list includes a hodge-podge of evidence, opinion, grievances and statements which are neither cognizable claims nor legal theories. In major respects, this list appears to be little more than slightly modified versions of the same claim. Giving Laura's list a liberal interpretation and some analytical help by the Court, it appears that he intends to try to prove the following claims at trial: failure to promote, improper

calculation of pay, failure to award appropriate raises and bonuses, undervaluing his status by giving him a less distinguished job title, and refusing to provide written and appropriate performance evaluations of his work. Dkt. 31. These claims of discrimination based on his an African-American and also not Japanese. *Id.*

These claims greatly exceed what Laura originally alleged in his Complaint—namely, disparate pay. Fuji thus requests that Laura's claims of disparate treatment as compared to Japanese or Asian employees be stricken, arguing that those claims fall outside the scope of Laura's Complaint and that Laura also failed to supplement his discovery responses regarding any such comparators. Dkt. 38 at 30. Fuji further requests that any claim of discrimination not directly tied to compensation be stricken as beyond the scope of Laura's Complaint. In any event, to use Fuji's terminology, they "do not hold water." *Id.*

Fuji's contention is correct that a plaintiff generally cannot amend his complaint by raising novel arguments later in the litigation. *See Shanahan v. City of Chicago,* 82 F.3d 776, 781 (7th Cir. 1996) (plaintiff may not amend his complaint through a brief filed in opposition of a motion for summary judgment or motion to dismiss). However, the Federal Rules of Civil Procedure's regime of notice pleading acknowledges that a plaintiff's rights are not frozen with the framing of the complaint. Rather, complaint must simply provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 517 (1993) (quotations omitted). Even under the recast requirements imposed by *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), the

12

complaint need not list all claims or specify all legal theories. It is subject to being freely amended or constructively amended as the case develops, so long as the amendments do not unfairly surprise or prejudice the defendant. *Del Marcelle v. Brown County Corp.,* 680 F.3d 887, 909 (7th Cir. 2012) (en banc); *Johnson v. City of Shelby,* —— U.S. ——, 135 S.Ct. 346, 347 (2014) (per curiam).

 As "the federal rules do not contemplate that parties will amend their pleadings to reflect new information obtained in the discovery process," *see Ash v. Wallenmeyer,* 879 F.2d 272, 274 (7th Cir. 1989), a brief that incorporates facts developed during the course of discovery may be dimmed to constructively amend a pleading, if the amendments do not unfairly surprise or prejudice the defendant. *Umar v. Johnson,* 173 F.R.D. 494, 503 (N.D.Ill.1997)(holding that "a party is then really engaged nothing more than the essential equivalent of amending the pleading to conform to the evidence (something that is permitted even post-judgment, see Rule 15(b))"); *cf. Whitaker v. Milwaukee Cty., Wisconsin*, 772 F.3d 802, 807-08 (7th Cir. 2014) (holding that the proffer of "new and drastic factual allegations" not contained in the pleadings or uncovered in discovery will not be allowed at the summary judgment stage). Moreover, in accordance with Rule 15(b)'s goal of providing the maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities, the court may constructively amend the pleadings to conform to the evidence at the summary judgment stage, even where there has been no formal motion by the parties. *Walton,* 875 F.2d at 1320 n. 3 (stating that "[a]lthough it is the judge rather than the parties who introduced the amendment, and although the amendment was effected during consideration of a motion for summary

judgment rather than at trial, it is fully consonant with the spirit of Rule 15(b) and

existing case law to view the pleadings as constructively amended here").

Thus, the question before us is whether a constructive amendment of Laura's

Complaint to include a theory of racial discrimination based on the disparate treatment of

Asian co-workers in addition to Caucasian co-workers and to include adverse

employment actions not directly related to Laura's claim of disparate pay, would unfairly

surprise or prejudice Fuji.  Although Plaintiff's discovery compliance has been far from

accepted standards, we find that Fuji would not by unfairly prejudiced by the Court's

constructive amendment of his pleading to conform to the evidence developed in the

course of discovery. [3] Laura's Complaint placed Fuji on notice that he was alleging racial

discrimination in the terms, conditions, and privileges of his employment. Dkt. 1.

Discovery provided a basis on which he is able to expand and particularize his claim to

include disparate treatment compared not only to his Caucasian co-workers, but also to

his Asian co-workers. Dkt. 39-6. Discovery further revealed a basis for Laura to allege

disparate treatment in more respects than simply his pay—to wit—other employees'

attendance, discipline, and requirements for promotions. Laura Dep 244:8–245:1. Based

on the evidence uncovered during discovery, Fuji has proven itself capable of mounting

adequate defenses to each of Laura's claims as is clear from its summary judgment

briefing, which includes the identification of each Asian co-worker with whom he may

---

[3] We remind Plaintiff that civil litigation "is not supposed to be merely a game, a joust, a contest," *Ash v. Wallenmeyer*, 879 F.2d 272, 275 (7th Cir. 1989), and we caution against any such attempts to secure a tactical advantage going forward. District courts conduct civil litigation with an eye toward discovering the truth, which is why we have decided to address the issues on their merits. However, district courts are not required to reward tactics designed to deprive the court or the factfinder of information needed to decide a claim fairly. *Johnson v. Hix Wrecker Serv., Inc.*, 528 F. App'x 636, 639 (7th Cir. 2013).

have been compared and the viability of each alleged adverse employment action. Thus, in accordance with Rule 15(b), we shall constructively amend Laura's Complaint to conform to the evidence revealed in discovery, but no further.

## Legal Standard

Summary judgment requires the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed.R.Civ.P. 56(c)(1)(A). A party can also support a material fact by showing that the evidence cited does not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed.R.Civ.P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed.R.Civ.P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's asserted fact being considered undisputed, and potentially in the grant of summary judgment. Fed.R.Civ.P. 56(e).

On summary judgment, a party must also show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.,* 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller,* 570 F.3d 868, 875 (7th Cir.2009). The Court views the record in the

15

light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.,* 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 630 (7th Cir.2011). The Court need only consider the cited materials, Fed.R.Civ.P. 56(c)(3)*,* and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson,* 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan,* 614 F.3d 684, 691 (7th Cir. 2010).

## Discussion

In his summary judgment briefing, Mr. Laura simply restates in numeric fashion paragraphs 7 through 19 of his above-mentioned "Statement of Claims & Legal Theories." As we have already noted, many of these "Section 1981 Claims" overlap with one another, while others do not state cognizable claims. None of the itemized "claims" has been tied to specific legal arguments or supporting evidence in the record. Rather, in Plaintiff's analysis, he states simply that his claims are itemized in Section III(c) of his brief, that the evidence supporting those claims can be found in Section II ("Statement of Material Facts in Dispute") of his brief, and that "[i]f [such] circumstantial evidence is considered here, these (sic) circumstantial facts to raise the inference of discrimination with respect to Laura's employment are as follows:"

> 1. Laura belongs to a racial minority. There is no dispute that Laura is, as an African American, not Japanese, that is, not an Asian, and is, thus, a member of two such groups.

16

2. Laura was qualified for the job of Assistant Warehouse Manager for many years, but was denied that vacant position for at least four years before he was promoted to it (with no raise in pay from his prior, lesser position as Warehouse Supervisor) in 2012, and that he was qualified and repeatedly rejected as a candidate for the job of Warehouse Manager on numerous occasions, and he has never been promoted to that position.

3. Laura was as qualified as any person who ever served in the capacity of the Fuji Warehouse Manager and/or Senior Warehouse Manager but was never appointed to that position.

4. The position of Assistant Warehouse Manager and Warehouse Manager remain vacant.

5. Laura was a salaried employee and not paid overtime rated for all of his overtime work while other Fuji salaried employees not in his protected classes were so paid.

6. Laura was not eligible to occupy a senior management position or independently make upper management decision at Fuji, due to his being [in] the protected classes.

7. Laura was perceived by Fuji as being a useless person because he was non-Japanese, and also an African American.

8. Laura suffered adverse job action in that he was not paid in the manner in which he should have been paid, that is, an appropriate salary together with periodic and appropriate raises in salary and bonuses for work he was performing.

9. Laura suffered adverse job action that have impeded his career, namely by not providing written and appropriate performance evaluation of his work so that he was actually evaluated in a discriminatory manner.

10. Fuji management denied Laura the same opportunities to interact with customers that it extended to other non-protected class members.

Dkt. 42 at 24–25.

Such disjointed lists of generalized "claims" and "circumstantial facts," each relying on nearly identical conclusory language and each devoid of citations, along with a request that the Court review his statement of facts in search of evidence to support his statements is a dereliction of duty by Plaintiff's counsel and an imposition on the Court. "It is the parties' duty to package, present, and support their arguments, and we shall not waste our time searching in vain for a dispute of material fact if we come across a factual contention or denial not adequately supported in the record." *See Roger Whitmore's Auto*

17

*Serv. v. Lake Cnty., Ill.*, 424 F.3d 659, 664 n.2 (7th Cir. 2005). Likewise, it is not the Court's function to make the parties' arguments for them; therefore, we will not go "truffle hunting" through the record, the briefs, or the law in order to craft possible arguments not sufficiently articulated before us. *Gutierrez v. Kermon*, 722 F.3d 1003, 1012 (7th Cir. 2013).

In an attempt to perform judicial triage we summarize/categorize Plaintiff's numerous allegations as follows: (1) claims unrelated to 42 U.S.C. § 1981; (2) a failure to promote claim; and (3) a disparate pay claim.

## I.    Claims Unrelated to 42 U.S.C. § 1981

Several of Laura's allegations are irrelevant to this action either because they do not involve race or because they do not represent a cognizable adverse employment actions pursuant to 42 U.S.C. § 1981. This includes the claims that: (1) he "was perceived as useless" by Fuji; (2) he did not receive appropriate raises, bonuses and salary "in spite of the tremendous growth of Fuji"; (3) he did not receive written work evaluations; (4) he did not receive necessary training; and (5) that Fuji created more than one organizational chart to operate its business. See Dkt. 42 at 17–18.

Courts do not sit as a "super-personnel department" with the plenary power to second-guess the wisdom and fairness of Fuji's business judgment and employment decisions. *Coleman v. Donahoe*, 667 F.3d 835, 862 (7th Cir. 2012); *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008); *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001). Thus, it is not our role to determine if Laura's pay was appropriate in relation to Fuji's growth, or whether it would be better practice for Fuji to

18

conduct written work evaluations and provide more training for its employees. Likewise, Fuji's use of multiple organizational charts and its official perception of Laura (whatever that means) do not represent cognizable adverse employment actions under 42 U.S.C. § 1981. Accordingly, we **GRANT** summary judgment in favor of Fuji on these "claims."

## II.     Failure to Promote

The allegations listed in paragraphs 1, 3, 4, 7, 9, 10, and 11 of "Laura's Particular § 1981 Claims" can properly be distilled into a single failure to promote claim. Dkt. 42 at 17–18. Specifically, Laura claims that following Barbara Smith's departure from Fuji in July 2008, he became the highest ranking employee in Fuji's Warehouse Department, who was responsible for all the work otherwise designated to that department's leader, yet was not assigned the title of Assistant Warehouse Manager until 2012. He has not even now been assigned the title(s) of Warehouse Manager or Senior Warehouse Manager. See *id.*

Typically in a failure to promote claim, the plaintiff must demonstrate that he was denied a promotion and that the defendant promoted someone from outside his protected group with similar or lesser qualifications. *See Johnson v. Indopco, Inc.*, 79 F.3d 1150 (7th Cir. 1996). Here, it is undisputed that Laura was the first and only employee to be named Assistant Warehouse Manager after the position became vacant in 2008. It is also undisputed that no Fuji employee currently holds or has held the title of Warehouse Manager, and that the Senior Warehouse Manager position is held by President Maehara, who holds the Senior Manager position in every department. Since it is clear that Laura became the leader of Warehouse Department immediately upon Smith's departure, his

actual complaint is that Fuji failed to promptly assign him a new title concomitant with his new duties.

Although Plaintiff contends that the assignment of a "less distinguished title" may form the basis of a prohibited adverse employment action, he cites no case which supports the argument that the withholding of a job title, alone, is actionable. Rather, the case law cited by both parties supports the majority rule that even demotions and transfers are insufficient if not accompanied by a change in pay, benefits, duties, or prestige. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (collecting cases); *see also Herrnreiter v. Chicago Housing Auth.*, 315 F.3d 742, 744 (7th Cir. 2002). Here, Laura became the highest ranking employee in Fuji's Warehouse Department when Barbara Smith left her employment with Fuji, and when he was designated the Assistant Warehouse Manager in 2012, his hourly pay, job responsibilities, and day-to-day activities remained the same as when he was the Warehouse Supervisor. See Pl.'s Resp. at 4 ("Laura did nothing different after he was given the job of Assistant Warehouse Manager than he did when he was a Supervisor in the warehouse."); Pl.'s Resp. at 29 ("Significantly, it is also undisputed that in 2012, when Laura was finally given the *title* of Assistant Warehouse Manager, he was paid virtually the same amount after that promotion as he had been paid before, that is, for 2011.") (emphasis in original). Laura similarly failed to offer any evidence that the Warehouse Manager title would have been or should have been accompanied by a raise in pay, benefits, or duties.[4] Because Laura assumed the position of department head for the Warehouse Department upon Barbara

---

[4] In an alternate iteration of this claim, Plaintiff contends that his title(s) have operated as an impediment to his career by making it harder to market his experience to other employers, yet he offers no evidence establishing that he was in contact with other employers or that the titles of Warehouse Supervisor or Assistant Warehouse Manager did not accurately reflect his duties with Fuji. Without evidence to support this version of his claim, it too fails.

Smith's departure in 2008, and because he has offered no evidence that being designated

a new title entitled him to additional responsibilities, pay, or benefits, his claims do not

constitute an actionable adverse employment action under 42 U.S.C. § 1981. *See*

*Herrnreiter*, 315 F.3d at 744. Accordingly, Fuji's motion for summary judgment is

**GRANTED** on all claims related to Plaintiff's title designations.

### III.   Disparate Pay

The remainder of Laura's claims properly construed as claims of disparate pay, in

violation of 42 U.S.C. § 1981. Specifically, Plaintiff alleges:

> 5. Laura suffered adverse job action in that he was not paid in the manner in which he should have been paid, namely overtime compensation when other salaried employees of Fuji who were not members of Laura's protected classes were paid for such overtime compensation.
>
> 6. Laura suffered adverse job action in that he was not paid in the manner in which he should have been paid, an appropriate salary together with periodic and appropriate raises in salary and bonuses for work he was performing including the substantially increased responsibilities of a Warehouse Manager and/or Senior Warehouse Manager, in spite of the tremendous growth of Fuji, along with concomitant increase in Laura's job responsibilities at work.[5]

Dkt. 42 at 5, 17–18.

A plaintiff may prove discrimination through direct or circumstantial evidence,

which may be analyzed under either the direct method, or the indirect method set forth in

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Coleman v. Donahoe*, 667

---

[5] As framed by Plaintiff here, this allegation contains no reference whatsoever to any Fuji employee outside Plaintiff's class or to Plaintiff's race. Since, as previously noted, the Court does not sit as a super-personnel department, and it is not our role to determine whether Laura's salary, raises, and bonuses accurately reflected the work he was performing; instead, we review Fuji's actions to ascertain only if they violated 42 U.S.C. § 1981, which prohibits racial discrimination and retaliation against employees. *See Nehan v. Tootsie Roll Indus., Inc.*, 2015 WL 5116876, at *2 (7th Cir. Sep. 1, 2015). Because Plaintiff offers comparisons to other employees and evidence regarding both race and pay later in his brief, we consider this allegation to encompass a claim of racial discrimination, in violation of 42 U.S.C. § 1981.

F.3d 835, 845 (7th Cir. 2012). The direct method allows a plaintiff to prove discrimination by providing "direct evidence" of intentional discrimination, or by compiling a "convincing mosaic of circumstantial evidence" of the same. *See Troupe v. May Dep. Stores Co.,* 20 F.3d 734 (7th Cir. 1994). Given the difficulty of proving an employer's intent "directly," the indirect method offers an alternative. Under the indirect method a plaintiff may create the presumption that his employer's actions were motivated by unlawful discrimination if he can meet the lower threshold of proving a *prima facie* case. *See Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014).

Laura has failed to identify the method under which he is proceeding here. Instead, simply cites the Seventh Circuit's decision in *Coleman v. Donahoe*, 667 F.3d. 835 (7th Cir. 2012), which, he stresses, replaced the two methods of analysis with the single determination of whether his evidence, when viewed as a whole, establishes a "convincing mosaic" of evidence sufficient to permit an inference of discrimination. Dkt. 42 at 15. While it is true the appellate court "bemoaned the snarls and knots" of the direct and indirect methods in its *Coleman* decision, it has further clarified that "the law remains the same." *See Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014) ("While all relevant direct *and* circumstantial evidence is considered (in its 'totality') in *both* methods, we do indeed consider the 'direct' and 'indirect' methods separately when reviewing summary judgment because we are not authorized to abjure a framework that the Supreme Court has established.") Thus, under both methods, the fundamental question remains "whether a reasonable jury could find prohibited discrimination." *See id.* (quotation omitted). Plaintiff must therefore structure his analysis in a manner which allows the court to fully and appropriately assess the evidence.

Laura invokes a hodge-podge of terminology drawing randomly from each method, referencing in certain instances his *prima facie* case while at other times denouncing the applicability of the indirect method's four-pronged test. Certain sections of his brief purport to reflect "direct evidence" and "circumstantial evidence" of discrimination, but that evidence is never tied to or associated with either a method or a specific claim. Although Plaintiff references on one occasion a *prima facie* case,(see Dkt. 42 at 19), his primary thrust is a request that the evidence be viewed as a whole in determining whether a "convincing mosaic" of discrimination has been established. This approach appears to be most closely analogous to the direct method's analysis of circumstantial evidence, so we shall proceed according to that approach.

### A. Direct Method

Under the direct method, Laura can succeed in avoiding summary judgment by presenting sufficient evidence, either direct or circumstantial to establish that Fuji acted out of racial animus or discrimination in paying him less than his co-workers who are outside his protected class. *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 809 (7th Cir. 2011).

### 1. Direct Evidence

Direct evidence is "evidence which if believed…will prove the particular fact in question without reliance on inference or presumption." *Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001) (internal quotations omitted). This type of "smoking gun" evidence is hard to come by as it "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Cerutti v. BASF Corp.*,

23

349 F.3d 1055, 1060–61 (7th Cir. 2003); *see also United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 716 (1983) ("[t]here will seldom be eyewitness testimony as to the employer's mental processes").

Laura cites four facts as "Direct Evidence" of a race based disparate pay claim: (1) Susan Thomas's testimony that, in her opinion, Laura was discriminated against based on his race, Thomas Dep. 226:11–13, 253:5– 15; (2) Thomas's testimony that "it was reported to her" that Fuji's former President, Mr. Sato, "at some point" referred to Laura as "useless" and threatened "to replace everyone with Japanese employees [because] they could do the job much quicker," Thomas Dep. 188:18–25, 230:10–19; (3) Laura's testimony that he was told by Thomas that he would have been paid more money if he were white or Japanese, Laura Dep. 290:1–4; and (4) Ken Tanahara's testimony that, in his opinion, Laura was treated differently than other salaried employees. Tanahara Dep. 54:13–20.

Although certain portions of this evidence may be fairly considered as circumstantial evidence, it is not "direct evidence" of discrimination. "An example of direct evidence would be an employer's admission that an adverse employment action was taken against an employee based solely on an impermissible ground, such as race. This type of evidence is admittedly rare." *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 272 (7th Cir. 2004). The opinions of Susan Thomas and Ken Tanahara do not constitute direct evidence of racial discrimination because neither was a decision-maker with respect to Laura's pay. Working in close association with the President of Fuji may have allowed them to arrive at personal impressions regarding of Laura's treatment, but those opinions do not equate to an admission by the decision-maker of racial animus or

24

discrimination. Likewise, Sato's alleged comment that Laura was "useless" and his threat to replace all the employees at Fuji with Japanese workers also falls short of constituting direct evidence of discrimination. Derogatory remarks such as this are considered direct evidence only "when the decision makers themselves, or those who provide input into the decision, express such feelings (1) around the time of, and (2) in reference to, the adverse employment action complained of." *Gorence*, 242 F.3d at 762 (7th Cir. 2001) (quoting *Hunt v. City of Markham, Ill.*, 219 F.3d 649 (7th Cir. 2000). Plaintiff has provided no evidence that Sato ever made good on his threat to replace the warehouse employees with Japanese workers, or that it resulted in any specific adverse employment action against him. Without the remark being tied to an adverse employment action, Sato's comments are no more than background that is arguably in support of an inference of discrimination. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

### 2. Circumstantial Evidence

In place of "direct evidence," Laura offers what he characterizes as a "convincing mosaic" of circumstantial evidence to suggest discrimination, albeit involving a long string of inferences. *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006). Courts have identified three categories of circumstantial evidence on which a plaintiff can rely in applying the "convincing mosaic" approach: (1) evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently; (2) evidence that the employer offered a pretextual reason for an adverse employment action; and (3) evidence of suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn. *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (collecting cases); *see also*

25

*Troupe v. May Dept. Stores*, 20 F.3d 734 (7th Cir. 1994). "Each type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together." *Id.* (citing *Troupe,* 20 F.3d at 736).

The first two categories resemble the elements required under the indirect method of proof, suggesting an overlap between them that might explain Laura's attempt to combine the analytical methods into to a single test. The mosaic approach provides parties and courts somewhat more flexibility and room for common sense than the indirect method typically allows. *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012). What the mosaic approach does not do, however, is grant Plaintiff license to "fact-dump" every fact big and small, significant or insignificant, that was unearthed during discovery, without regard to whether it is inadmissible, irrelevant, or speculative hoping that the court will sift through the record to figure out what matters and how.[6]

Throughout his brief, Laura discusses the treatment of numerous other Fuji employees, each of whom he alleges was treated or paid better by Fuji. For example, Laura claims that Elizabeth Johnson and Frank Qin, salaried salespersons in Fuji's Sales

---

[6] We have not considered Thomas's statement that Maehara was prejudiced against Laura or her testimony that Laura would have been paid more and promoted faster if he were Japanese, given that Thomas could not attest to Maehara's mental state or predict what might have happened if Laura were of another nationality. See Fed. R. Evid. 602.  We similarly have not considered Ken Tanahara's statement that Laura was treated differently than other employees because it lacks relevance to Laura's § 1981 claim in light of his testimony (located just a few lines away) that he did not believe the disparate treatment was based on race. Tanahara Dep. 54:13–20. Finally, we have not considered Thomas's testimony regarding Fuji's parent company's directors and their comments concerning "Japanese expatriates" as they too are irrelevant both because Fuji's parent company is not a party to this action and because claims of discrimination based on national origin are not cognizable under 42 U.S.C. § 1981. While we do consider claims of racism and ethnicity as they apply to Laura's Asian co-workers, any references made to "expatriates" clearly signal preferences of national origin and citizenship, not race. *See Von Zuckerstein v. Argonne Nat. Lab*, 984 F.2d 1467, 1472 (7th Cir. 1993).

Department, received overtime compensation during a period of time when Laura did not.[7] Dkt. 42 at 6, 13. He further alleges that Horace Tucker, Jim Christie, Nigel Christen, and Tomoyasu Masuyama was each paid a higher income than he received. Dkt. 42 at 30. Laura has not classified these employees as "comparators" to him or provided any explanation as to ways in which they may be similarly situated to him. Instead, he maintains that "it is simply is (sic) not necessary to have a similarly situated comparator to make a viable claim." Dkt. 42 at 19. While it is true that a plaintiff who amasses sufficient direct evidence of discrimination may proceed without evidence of similarly-situated comparators, the treatment of other employees by the employer is relevant to the extent they employees are similarly situated to the plaintiff. In other words, assuming Laura seeks to have the court consider the experiences of other Fuji employees, he must provide some evidentiary basis upon which a "meaningful comparison" can be conducted that would permit a reasonable jury to infer discrimination. *See Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). Without any basis for the comparison whatsoever of the above-mentioned employees, this evidence comes up short. We remind counsel that it is not incumbent on the Court to parse the record in an effort to identify or formulate a winning theory of relief. We note. Consistent with Fuji's argument, that each of these employees held a different position from Laura's, in a different department, with different duties. "The most obvious and common reason to pay one employee more or less than

---

[7] More precisely, Laura claims that after he became a salaried employee in March 2013, Fuji ceased paying him overtime compensation. Then, on some unspecified date in 2014, Fuji began paying him for work done on weekends devoted to Fuji's largest customer ("Subaru Saturdays"). Meanwhile, Qin and Johnson received overtime pay for all work done in excess of forty hours, until some other unspecified date in 2014, when Fuji ceased making those overtime payments. Currently Laura earns overtime compensation only for work done on "Subaru Saturdays," whereas Qin and Johnson earn no overtime whatsoever.

another is that they are not performing similar jobs." Dkt. 43 at 4 (quoting *Beard v.*

*Whitley Cty. REMC*, 656 F. Supp. 1461, 1472 (N.D. Ind. 1987).

Laura does, however, proffer one Fuji employee as an appropriate comparator:

former Assistant Warehouse Manager, Mike French. See Dkt. 42 at 11. Fuji asserts that

French, who served as Assistant Warehouse Manager from 1992 to 2007, was paid less

than Laura; during his final year of employment with Fuji his bi-weekly salary was

$1,682.18, whereas Laura began receiving a bi-weekly salary of $1730.87 in March

2013, which was thereafter was raised to $1,750 in April 2014. Dkt. 38 at 5 (citing

Rhodes Aff. ¶ 6).  Laura argues that this comparison should begin, not when he began

receiving salary in 2013 or when he received the *title* of Assistant Warehouse Manager in

2012, but when he became the *de facto* head of the Warehouse Department in 2008.

According to Laura, although he assumed responsibility for the duties assigned to the

Assistant Warehouse Manager in July 2008, he continued to receive the same hourly rate

of $16.62 until January 28, 2012. Dkt. 46 at 4. Thus, he maintains, while Mike French, a

white employee, was paid $46,135.65 in 2006, Laura earned $44, 197.24 in 2011 for

performing the same duties as the head of the Warehouse Department. Hunt Aff. Exs. 3,

4.

As noted previously, it is undisputed that, as of July 2008, Laura was the highest

ranking and highest paid employee in Fuji's Warehouse Department. Laura contends that

the fact that his responsibilities, pay, and duties remained the same after he was given the

*title* of Assistant Warehouse Manager is evidence of discrimination against him,

especially compared to Mike French's salary. Fuji explains in detail that job titles are not

correlated with increases in pay and responsibilities. See e.g., Dkt. 43 at 17 (explaining

that there is "no evidence that Fuji always provides a pay increase when it promotes a department leader to a higher *title*."). Whether the comparison between Laura and French should include the time between Laura's assumption of leadership responsibilities for the Warehouse Department and his eventual receipt of the Assistant Warehouse Manager title is a fact we cannot resolve on summary judgment. The evidence establishes that approximately five years after French's departure, Laura was being paid slightly less than $2,000 less annually for fulfilling virtually the same role French had held. *See Srail v. Village of Lisl*, 588 F.3d 940, 945 (7th Cir. 2009) ("Whether a comparator is similarly situated is 'usually a question for the fact-finder,' and summary judgment is appropriate only when 'no reasonable fact-finder could find that plaintiffs have met their burden on the issue.' ").

The opinion of Susan Thomas, Fuji's Manager of Human Resources at the time, was that the difference in salary was attributable to Laura's race. Thomas Dep. 226:11–13, 253:5–15. Her opinion primarily reflected the evaluation she completed in 2008, which stated that Fuji was "expecting more from Doug than from any other Warehouse MGR" and explicitly compared him to Barbara Smith and Mike French, whom she believed received preferential treatment. Thomas Dep. 227:10–15, Dkt. 42-1 at 14. Her evaluation provided that she "believe[d] Management ha[d] done very little [to motivate, encourage, and train Laura] due to the preconceived idea that Douglas [wa]s useless, " as expressed by Kazou Sato, Fuji's acting President from 2008 to 2011. Thomas Dep. 188:18–25, 230:10–19. Notwithstanding Fuji's alleged failure to motivate, encourage, and train Laura, it was Thomas's opinion that Laura consistently performed "above average." *Id.* Likewise, Ken Tanahara and Makoto Maehara described the quality of

Laura's work as "very good," "well done," and "well executed." Tanahara Dep. 39:9–40:4; Maehara Dep. 16:9–11.[8]

Taken together, Laura's receipt of less pay compared to Mike French, Thomas's testimony that Laura was treated differently by Fuji based on his race, and the overall positive assessment of the quality of Laura's work constitutes sufficient evidence on which a reasonable jury could infer discrimination. Accordingly, we **DENY** Fuji's motion for summary judgment on Laura's claim of disparate pay.

## Conclusion

Defendant's Motion for Summary Judgment [Docket. No. 37] on Laura's disparate pay claim is **DENIED**.[9] Defendant's motion on all other claims is **GRANTED**.

IT IS SO ORDERED.

Date: 2/2/2016

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

[8] Plaintiff contends that the overall approval of his work combined with absence of any formal evaluations or written criticism suffices to show that Maehara's reasons for issuing him a 1.11% raise in April 2014 were pretextual. See Dkt. 46 at 2. While this evidence falls short of establishing pretext—in that it does not establish that Maehara's assessment of Laura's management skills, leadership qualities, and work ethic as well as his consideration of shipping and labeling errors was in fact a "coverup" for unlawful discrimination, see *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805 (1973)—it is relevant circumstantial evidence of Laura's disparate treatment claim.

[9] This claim is of course limited to disparate pay as compared to former leaders of the Warehouse Department, namely Mike French and Barbara Smith, and the 4–year statute of limitations pursuant to § 1658. Recovery may be sought only with respect to paychecks received after June 2, 2010. *See Groesch v. City of Springield, Ill.*, 635 F.3d 1020, 1027 (7th Cir. 2011) (explaining application of the paycheck accrual rule).

Distribution:

Robert F. Hunt
HUNT HASSLER LORENZ & KONDRAS LLP
hunt@huntlawfirm.net

Byron L. Myers
ICE MILLER LLP
byron.myers@icemiller.com

Germaine Winnick Willett
ICE MILLER LLP
germaine.willett@icemiller.com